**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JACQUELINE DANIELS, | CASE NO. 1:23-cv-02303 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Jacqueline Daniels ("Plaintiff" or "Ms. Daniels") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Income ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 6.)

For the reasons explained herein, the Court **VACATES AND REMANDS** the Commissioner's decision for further proceedings consistent with this Opinion.  On remand, the ALJ should accurately discuss the evidence, clearly articulate the reasons for the weight assigned to the medical opinions of record and for the subjective symptom analysis, and should ensure that his rationale builds an accurate and logical bridge between the evidence and the result.

## I.    Procedural History

Ms. Daniels's appeal relates to her application for DIB filed on November 20, 2016, alleging a disability onset date of December 23, 2012.  (ECF Doc. 8, p. 1; Tr. 153, 326, 2890.)  Ms. Daniels's date last insured was December 31, 2018.  (Tr. 2892.)  She alleged disability due

1

to right shoulder injury, neck injury, cervical myofascial condition, neck spasms, fibromyalgia, chronic fatigue syndrome, anxiety, and depression.  (Tr. 136-37, 155.)  She has received four unfavorable decisions from three different Administrative Law Judges relating to her November 20, 2016 application.  (ECF Doc. 8, pp. 1-2.)

The first unfavorable decision was issued on August 1, 2018 (Tr. 170-90) and was remanded by the Appeals Council for additional proceedings on December 7, 2018 (Tr. 191). On remand, the Appeals Council directed the Administrative Law Judge ("ALJ") to "further consider the severity of the claimant's right shoulder impairment and the severity of the claimant's mental impairments," and "address in a new decision all opinions that touch[ed] on the claimant's residual functional capacity."  (Tr. 10.)

The second unfavorable decision was issued by the same ALJ on July 29, 2019 (Tr. 7-45, 2943-81) and was remanded by the District Court for further proceedings on July 2, 2020, pursuant to the parties' stipulation (Tr. 3094).  The Appeals Council then remanded the matter on August 25, 2020.  (Tr. 3099-3100, 3106.)  In its remand order,

> [T]he Appeals Council noted that the Administrative Law Judge assigned great weight to the opinions of the State Agency medical consultants, Dr. Bekal and Dr. Bolz, but their reaching limitations were more restrictive than the Administrative Law Judge's residual functional capacity and she did not adequately explain why she diverted from these limitations. As such, the Appeals Council directed . . . further evaluat[ion] [of] the State Agency medical consultants' opinions and the claimant's residual functional capacity.

(Tr. 3106.)

The third unfavorable decision was issued by a new ALJ on January 19, 2021 (Tr. 3103-27, 3103-06) and was remanded again by the Appeals Council for additional proceedings on November 21, 2022 (Tr. 3128-33).  The Appeals Council found that the ALJ's decision did not contain "accurate information regarding the reason that the claimant's worker's compensation

benefits terminated" and did not contain an adequate evaluation of opinion evidence, including opinions relating to Ms. Daniels's right upper extremity impairment.  (Tr. 3130-32.)

The fourth unfavorable decision was issued by a new ALJ on April 26, 2023 (Tr. 2886-2936), following a telephonic hearing before the ALJ on March 21, 2023 (Tr. 2983-3016).  Ms. Daniels filed exceptions to the ALJ's April 26, 2023 decision.  (Tr. 3245-46.)  On September 26, 2023, the Appeals Council declined to assume jurisdiction, making the ALJ's April 26, 2023 decision the final decision of the Commissioner.  (Tr. 2879-884.)  Ms. Daniels filed the pending appeal on November 30, 2023.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 8 & 10.)

## II.       Evidence

Although the ALJ identified both physical and mental impairments (Tr. 2892), Ms. Daniels focuses her argument on the physical impairments that impact her ability to reach with her right upper extremity (*see* ECF Doc. 8).  The evidence summarized herein is therefore focused on the evidence relevant to her ability to reach with her right upper extremity.

### A.       Personal, Educational, and Vocational Evidence

Ms. Daniels was born in 1975.  (Tr. 2924.)  She was 43 years old on her date last insured. (*Id*.)  She graduated from college with a degree in science and business management (Tr. 59) and served in the United States Army for four years (Tr. 82).  She worked as a mail carrier for the United States Post Office for at least fifteen years prior to her work injury in December 2012. (Tr. 55, 62, 556, 2901, 2923, 3001.)

### B.       Medical Evidence

#### 1.       Relevant Treatment History

On December 24, 2012, Ms. Daniels suffered an injury at work when a metal shelf with heavy packages fell, hitting her head, neck, and shoulder.  (Tr. 556, 590, 2901, 3001.)  She

3

presented to Davinder Bhullar, M.D., at MEDGroup on December 26, 2012, for a Workers Compensation evaluation.  (Tr. 590.)  She was diagnosed with right shoulder rotator cuff contusion and strain and right paracervical strain.  (Tr. 591.)  Dr. Bhullar advised that if Ms. Daniels did not improve with anti-inflammatories they would proceed with an MRI.  (*Id.*)  He recommended that Ms. Daniels start physical therapy for her neck and right shoulder.  (*Id.*)

Ms. Daniels returned to MEDGroup on December 31, 2012, and was treated by Daniel Breitenbach, M.D.  (Tr. 592.)  On examination, Ms. Daniels displayed: pain with palpation of the right anterior shoulder; pain with attempted abduction of the right arm at 45 degrees; positive Neer and Hawkins signs; palpable tenderness over superior scapular border on the right; pain over the right paracervical muscles; pain with extension and rotation left and right of the neck.  (*Id.*)  Ms. Daniels was diagnosed with right shoulder rotator cuff contusion with strain and right paracervical strain.  (*Id.*)  Dr. Breitenbach continued Ms. Daniels on Mobic and Robaxin, started her on Vicodin, and recommended physical therapy and an MRI of the right shoulder.  (Tr. 593.)

*2013*

A January 23, 2013 MRI of her right shoulder showed supraspinatus tendinitis, coracoacromial ligament sprain, acromioclavicular joint hypertrophy with impingement, and subcutaneous soft tissue contusion along the superior aspect of the shoulder.[1] (Tr. 958-59, *see also* Tr. 600.)  Throughout 2013, Ms. Daniels continued to see Dr. Breitenbach on a regular basis.  (Tr. 594-671.)  In 2013, she also saw pain management physician Jerome Yokiel at the Centers for Comprehensive Pain Care (Tr. 548, 640, 660) and orthopedist Robert B. Leb, M.D. (Tr. 545, 658, 602 *see also* Tr. 1392), and she attended physical therapy (*see generally* Tr. 602, 606, 610, 616, 621, 630, 638, 652, 656, 662, 666, 668).

---

[1] Ms. Daniels had a cervical MRI in early 2013, which showed a bulging disc at C5-C6 without pressing on the nerve root.  (Tr. 606, 608.)  The MRI also showed cervical muscle spasm. (*Id.*)

In March 2013, Dr. Breitenbach recommended a cortisone injection in Ms. Daniels's right shoulder.  (Tr. 609.)  Ms. Daniels's diagnoses included sprains and strains of rotator cuff capsule and sprains and strains of neck.  (*Id*.)  Approval for the cortisone injection was obtained in May 2013 (Tr. 624) and in June 2013 her orthopedic surgeon administered the injection (Tr. 630).  During a June 14, 2013 appointment with Dr. Breitenbach, Ms. Daniels reported that the cortisone injection helped with her shoulder pain.  (Tr. 630.)  But when she returned to Dr. Breitenbach on June 24, 2013, she reported that her shoulder pain had returned.  (Tr. 632.)

On August 1, 2013, Ms. Daniels attended a pain management visit.  (Tr. 640.)  At that visit, cervical injections and Topamax were recommended.  (*Id*.)  On September 5, 2013, Ms. Daniels had an injection in her neck that was administered by Dr. Yokiel.  (Tr. 548, 646, 648.)  She had another MRI of the right shoulder at that time, which showed acromioclavicular joint hypertrophy with impingement and severe tendinitis of the supraspinatus.  (Tr. 648.)  She had another cervical injection on September 12, 2013.  (Tr. 548, 650.)  The following day during a visit with Dr. Breitenbach, she reported she was not doing well and was sore.  (Tr. 648.)

On September 20, 2013, Ms. Daniels reported to Dr. Breitenbach that, since the injection, she was having dizziness, her legs were giving out, and she had soreness and pressure at the injection site.  (Tr. 652.)  On September 27, 2013, when Ms. Daniels returned to Dr. Breitenbach, she reported she had gone to the emergency room due to pain in her neck and right shoulder, and that an MRI showed muscle spasms in the back of her neck.[2]  (Tr. 654.)  Ms. Daniels also reported that her third cervical injection was cancelled.  (*Id*.)  Ms. Daniels's pain medication was

---

[2] Ms. Daniels presented to the emergency room at the Cleveland Clinic on September 20, 2013, complaining that, since her cervical injection, her legs were buckling, her arms were numb, and she had a fever.  (Tr. 1103-04.)  She was admitted, diagnosed with neck pain, and discharged the next day with some improvement in her symptoms and instructions to follow up with her spine surgeon.  (Tr. 1109-10.)

changed from Vicodin to Percocet (Tr. 654-55) but Vicodin was prescribed again in October 2013 for use as needed for pain (Tr. 657, 663).

During a November 7, 2013 appointment, Dr. Breitenbach recommended that Ms. Daniels speak with her orthopedic surgeon about possible surgery because they had "been unable to fix her neck." (Tr. 664.)  On examination, Ms. Daniels had pain with abduction at 90 degrees in her right shoulder and positive Neer and Hawkins signs.  (Tr. 665.)  On November 21, 2013, Ms. Daniels continued to complain of pain in her neck and right shoulder.  (Tr. 666.)  Dr. Breitenbach suggested that she might benefit from trigger point injections; Ms. Daniels said she would follow up with pain management on that issue.  (*Id.*)  On examination, Ms. Daniels again demonstrated pain with abduction at 90 degrees in her shoulder and pain with positive Neer and Hawkins signs.  (Tr. 667.)  Dr. Breitenbach refilled Ms. Daniels's Vicodin prescription and recommended that she continue with physical therapy.  (*Id.*)  On December 20, 2013, Ms. Daniels informed Dr. Breitenbach that shoulder surgery was planned for January, and she was scheduled to see pain management in January.  (Tr. 670.)

*2014*

Ms. Daniels continued to see Dr. Breitenbach throughout 2014.  (Tr. 672-718.)  Leading up to her right shoulder surgery on February 12, 2014 (Tr. 1392-94), her physical examinations continued to reveal pain with abduction at 90 degrees in her right shoulder and pain with positive Neer and Hawkins signs.  (Tr. 673, 675, 677.)  On February 12, 2014, Dr. Leb performed a right shoulder surgery at Northeast Ohio Surgery Center.  (Tr. 1392-94.)  Ms. Daniels's preoperative diagnosis was right shoulder impingement syndrome with distal clavicle osteophytes.  (Tr. 1392.)  The surgery involved diagnostic and operative arthroscopy, debridement of the subacromial bursa, debridement of the rotator cuff tear, partial distal claviculectomy and

subacromial decompression.  (*Id*.)  Her postoperative diagnosis was right shoulder impingement syndrome with distal clavicle osteophytes, with a partial thickness rotator cuff tear.  (*Id*.)

On February 24, 2014, Ms. Daniels returned to Dr. Breitenbach, reporting she was still feeling pain after her surgery.  (Tr. 678.)  Ms. Daniels started physical therapy in February 2014 and attended eighteen sessions through April 2014.  (Tr. 1264, 1271.)  During an April 17, 2014 appointment with Dr. Breitenbach, Ms. Daniels reported some improvement since her right shoulder surgery.  (Tr. 680.)  But she rated her neck pain a six out of ten.  (*Id*.)  A few weeks later, on May 1, 2014, Ms. Daniels complained of pain in her shoulder, neck, and back.  (Tr. 682.)  Dr. Breitenbach provided her with refills of her medication and recommended acupuncture treatment.  (Tr. 683.)  Her diagnoses included: sprains and strains of rotator cuff capsule, shoulder and upper arm, and supraspinatus; bursae and tendon disorder; and contusion in the shoulder region.  (*Id*.)  During an appointment with Dr. Breitenbach on June 19, 2014, Ms. Daniels reported a pain level of five out of ten.  (Tr. 688.)  She did not yet have an appointment with an acupuncturist.  (*Id*.)  On physical examination, she demonstrated tender cervical musculature, pain in her back with flexion or extension, neck pain with rotation to the right or left, pain with abduction of the right arm at 90 degrees, and normal abduction of the left arm at 150 degrees without pain.  (Tr. 689.)

Ms. Daniels continued with physical therapy through June 2014.  (Tr. 1278.)  She reported muscle spasms throughout her back and cervical spine that limited her ability to perform lifting tasks and overhead reaching.  (*Id*.)  During a right shoulder examination by Dr. Leb on June 26, 2014, she demonstrated some tenderness to the subacromial space and her range of motion was forward elevation to 150 degrees, abduction to 150 degrees, crossbody adduction to 40 degrees, internal rotation to 80 degrees, and external rotation to 90 degrees.  (Tr. 1279.)  It

7

was determined that Ms. Daniels had plateaued as far as her need for skilled therapy because "exercise progression [was] limited by neck pain." (Tr. 1278.)  She was discharged from therapy with a recommendation for vocational rehabilitation if deemed appropriate. (Tr. 1278-79.)

On July 3, 2014, Ms. Daniels returned to Dr. Breitenbach. (Tr. 690.)  She complained of pain in her right shoulder and neck. (*Id.*)  She reported attending her first acupuncture appointment without any significant changes. (*Id.*)  On examination, she demonstrated tenderness of the cervical musculature, pain in her back with flexion or extension, neck pain with rotation to the right or left, and pain in the neck and shoulder with abduction of the right arm at 90 degrees. (Tr. 691.)  Ms. Daniels returned to Dr. Breitenbach on August 14, 2014, reporting pain in her neck and right shoulder and saying she felt like she had impingement of the right shoulder despite her surgery. (Tr. 692.)  She reported that acupuncture treatments provided her about three days of improvement before her pain returned. (*Id.*)  On examination, Ms. Daniels demonstrated pain in the right shoulder with abduction at 90 degrees and positive Neer and Hawkins signs. (Tr. 693.)  Permission for an MRI was obtained in August 2014. (Tr. 695.)

When Ms. Daniels returned to Dr. Breitenbach on September 11, 2014, she continued to report pain in her right shoulder and neck. (Tr. 698.)  She reported waking up in pain during the night and said Vicodin was not helping relieve her pain even though she was doubling up on it. (*Id.*)  She was planning to start physical therapy the following week. (*Id.*)  Dr. Breitenbach reviewed her MRI results, noting they were unchanged. (*Id.*)  On examination, Ms. Daniels continued to have pain in her right shoulder with abduction at 90 degrees and pain with positive Neer and Hawkins signs. (Tr. 699.)  Dr. Breitenbach advised Ms. Daniels to stop Vicodin and start Percocet as necessary for pain. (*Id.*)

Ms. Daniels returned to Dr. Breitenbach on October 9, 2014, reporting that her pain level was a six out of ten.  (Tr. 703.)  On examination, she continued to demonstrate pain in her right shoulder with abduction at 90 degrees and positive Neer and Hawkins signs.  (Tr. 704.)  She also had tenderness of the cervical musculature and dorsal paraspinous, increased pain with flexion or extension of her neck, and pain with rotation of her head left or right.  (*Id.*)  Dr. Breitenbach advised Ms. Daniels to continue with Percocet for pain and to continue with physical therapy.  (*Id.*)  He planned to request approval for a pain management consultation.  (*Id.*)  On October 23, 2014, Ms. Daniels reported a pain level of five out of ten in her right shoulder and neck.  (Tr. 706.)  She said physical therapy was not helping, and that she had a headache or felt worse when she finished with therapy.  (*Id.*)  She was scheduled to see pain management.  (*Id.*)  On examination, she continued to demonstrate pain in her right shoulder with abduction at 90 degrees and positive Neer and Hawkins signs.  (Tr. 707.)

During an appointment with Dr. Breitenbach on November 6, 2014, Ms. Daniels reported frustration with her other doctors and the lack of healing nine months post-surgery.  (Tr. 709.)  She reported her pain was a six out of ten.  (*Id.*)  Her orthopedic surgeon scheduled her for a cortisone injection, and she was scheduled to see pain management.  (*Id.*)  She had a cortisone injection in her right shoulder on December 4, 2014.  (Tr. 715.)  When she saw Dr. Breitenbach the following day, she reported that her right shoulder was sore at the injection site and rated her pain a five out of ten.  (*Id.*)  On examination, Ms. Daniels displayed pain in her right shoulder with abduction at 100 degrees and positive Neer and Hawkins signs.  (Tr. 716.)

*2015*

Ms. Daniels continued to see Dr. Breitenbach regularly throughout 2015 and continued to treat her pain with pain medication and muscle relaxers.  (Tr. 719-771.)  She also saw Dr. Leb in

2015.  (Tr. 1303-05, 1325-28, 1335-38.)  During visits with Dr. Breitenbach in 2015, she continued to report pain in her shoulder, neck, and back; her right shoulder examination typically revealed pain with abduction between 90 and 120 degrees.[3]  (Tr. 719-771.)

When she saw Dr. Breitenbach on January 30, 2015, Ms. Daniels reported that acupuncture was helping her sleep at night.  (Tr. 723.)  During an April 2, 2015 visit with Dr. Breitenbach, she continued to complain of pain in her right shoulder and neck. (Tr. 732.)  She relayed that her orthopedist wanted another MRI of her right shoulder to determine if there was a tear.  (*Id.*)  She was scheduled to start physical therapy.  (*Id.*)  On examination, she continued to demonstrate pain with abduction in her right shoulder/arm at 90 degrees and had positive Neer and Hawkins signs.  (Tr. 733.)

Ms. Daniels returned to Dr. Leb on April 21, 2015.  (Tr. 1303-05.)  She complained that her shoulder had gotten worse.  (Tr. 1303.)  She said physical therapy made her pain worse, but she was scheduled to start acupuncture.  (*Id.*)  Range of motion testing for her right shoulder showed elevation to 130 degrees, extension to 40 degrees, external rotation to 70 degrees, internal rotation to 60 degrees, adduction to 50 degrees, and abduction to 120 degrees.  (Tr. 1304.)  Suprapinatus and infraspinatus strength was 4/5 and Neer and Hawkins signs were positive.  (*Id.*)  Dr. Leb recommended continued physical therapy, Ibuprofen, Voltaren gel, and the pain medications prescribed by Dr. Breitenbach.  (Tr. 1305.)  He also recommended an MRI of the right shoulder, noting that clinical findings suggested a tear.  (*Id.*)

On May 28, 2015, Ms. Daniels reported to Dr. Breitenbach that her MRI showed a tear of the rotator cuff and she was scheduled for surgery in July.  (Tr. 740.)  Ms. Daniels was unable to lift her arm above shoulder level, had positive Neer and Hawkins signs, and demonstrated pain in

---

[3] There was one instance where range of motion testing with abduction fell outside this range; on August 17, 2015, Ms. Daniels exhibited pain with abduction in the right shoulder at 75 degrees.  (Tr. 752.)

her neck with flexion, extension, and rotation.  (*Id*.)  Ms. Daniels continued to regularly see Dr. Breitenbach until her surgery on July 29, 2015.  (Tr. 743-50.)

On July 29, 2015, Ms. Daniels had a second right shoulder surgery.  (Tr. 1395-97.)  The preoperative diagnosis was right shoulder impingement syndrome, possible rotator cuff tear.  (Tr. 1395.)  The surgery—diagnostic and operative arthroscopy on the right shoulder, extensive subacromial bursectomy, and anterior acromioplasty—was performed by Dr. Leb at Northeast Ohio Surgery Center.  (*Id*.)  The postoperative diagnosis was right shoulder impingement syndrome, possible rotator cuff tear with just impingement syndrome, less than 25% thickness with a partial thickness rotator cuff tear.  (*Id*.)

Ms. Daniels returned to Dr. Breitenbach on August 17, 2015, following her surgery.  (Tr. 751.)  She reported some pain in her right shoulder.  (*Id*.)  She was participating in physical therapy and requested medication refills.  (*Id*.)  On examination, she demonstrated pain with abduction of the right shoulder at 75 degrees and positive Neer and Hawkins signs.  (Tr. 752.)  When she returned to Dr. Breitenbach on August 31, 2015, her examination revealed pain with abduction of the right shoulder at 90 degrees and positive Neer and Hawkins signs.  (Tr. 755.)

On September 14, 2015, Ms. Daniels saw Dr. Breitenbach and reported that her right shoulder pain was a three out of ten, and her neck pain was a six out of ten.  (Tr. 756.)  Her right shoulder examination revealed pain with abduction of the right shoulder at 100 degrees and positive Neer and Hawkins signs.  (Tr. 757.)

Ms. Daniels returned to Dr. Leb on September 22, 2015.  (Tr. 1325-28.)  Dr. Leb recommended an additional twelve weeks of physical therapy.  (Tr. 1325.)  He noted that Ms. Daniels was making slow but gradual progress with her right shoulder range of motion but was limited due to continued weakness of the rotator cuff musculature and pain, and that her cervical

11

symptoms and pain were limiting her ability to progress with therapy.  (*Id*.)  On right shoulder examination, Ms. Daniels displayed tenderness to the subacromial space / lateral deltoid; crepitus was not present during range of motion testing; range of motion testing showed elevation to 150 degrees, abduction to 120 degrees, and external and internal rotation to 80 degrees; supraspinatus and infraspinatus strengths were deferred; and Neer and Hawkins signs were positive.  (Tr. 1326.)  Dr. Leb recommended that Ms. Daniels continue with physical therapy, Ibuprofen, Voltaren gel, and pain medications prescribed by Dr. Breitenbach.  (Tr. 1327.)

When Ms. Daniels returned to Dr. Breitenbach on September 28, 2015, she said her shoulder was getting better, but her neck was hurting, and physical therapy was trying to get permission to treat her neck pain.  (Tr. 758.)  Her right shoulder examination revealed pain with abduction of the right shoulder at 110 degrees and positive Neer and Hawkins signs.  (Tr. 759.)  She continued to treat her pain with pain medications and muscle relaxers.  (Tr. 758-59.)

Ms. Daniels returned to Dr. Breitenbach on October 12, 2015, complaining of neck spasms.  (Tr. 760.)  Examination of her neck revealed tenderness with increased pain with flexion or extension of the neck and pain with rotation of her head right or left.  (Tr. 761.)  Her right shoulder examination revealed pain with abduction at 120 degrees.  (*Id*.)  During a visit with Dr. Breitenbach on November 24, 2015, Ms. Daniels reported the pain in her neck and right shoulder was a six out of ten.  (Tr. 766.)  She was getting physical therapy for her right shoulder and recently received an additional diagnosis of cervical sprain.  (*Id*.)  On examination of her right shoulder, she had pain with abduction at 110 degrees.  (Tr. 767.)  Examination of her neck continued to reveal tenderness with increased pain with flexion or extension of the neck and pain with rotation of her head right or left.  (*Id*.)

On December 1, 2015, Ms. Daniels returned to Dr. Leb.  (Tr. 1335-38.)  She reported that her shoulder was getting better, but her neck was the same.  (Tr. 1335.)  On examination of the cervical spine, there was no spasm present, there was tenderness upon palpation to the right trapezius, muscle strength was symmetric in upper extremities, her neurosensory exam was intact in the upper extremities, and pain radiated to the right trapezius and shoulder.  (Tr. 1336.)  Range of motion in the cervical spine revealed flexion to 20 degrees, extension to 0 degrees, rotation to 20 degrees bilaterally, and side bending to 20 degrees bilaterally.  (*Id.*)  Examination of the right shoulder revealed no tenderness to the biceps tendon / the subacromial space / lateral deltoid / posterior deltoid / AC joint and no crepitus during range of motion testing.  (*Id.*)  Range of motion testing in the right shoulder revealed elevation and abduction to 160 degrees, internal rotation to 80 degrees, and external rotation to 90 degrees.  (*Id.*)  Supraspinatus and infraspinatus strengths were 5/5.  (*Id.*)  Hawkins and Neer signs were negative.  (*Id.*)  Dr. Leb recommended that Ms. Daniels continue with Ibuprofen, Voltaren gel, and pain medications prescribed by Dr. Breitenbach.  (Tr. 1337.)  He noted that Ms. Daniels's return to work status was light duty as of October 27, 2015, with no overhead lifting.  (*Id.*)

On December 8, 2015, Ms. Daniels reported to Dr. Breitenbach that she was getting physical therapy for her neck and felt it was making it worse.  (Tr. 768.)  She was also starting to have pain in her left shoulder.  (*Id.*)  She rated her neck and right shoulder pain at five out of ten.  (*Id.*)  On right shoulder examination, she demonstrated pain with abduction at 90 degrees and positive Neer and Hawkins signs.  (Tr. 769.)  Her neck examination continued to reveal tenderness, increased pain with flexion or extension of the neck, and pain with rotation of her head right or left.  (*Id.*)  During a December 22, 2015 visit with Dr. Breitenbach, examination of Ms. Daniels's right shoulder revealed pain with abduction at 120 degrees and positive Neer and

Hawkins signs.  (Tr. 771.)  Her neck examination continued to reveal tenderness with increased

pain with flexion or extension and pain with rotation of her head to the right or left.  (*Id*.)

*2016*

Ms. Daniels continued to see Dr. Breitenbach regularly throughout 2016 and continued to

treat her pain with pain medication and muscle relaxers.  (Tr. 772-77, 1574-1626.)  She

continued to report pain in her shoulder, neck, and back, and right shoulder examinations

typically revealed pain with abduction around 120 degrees.  (Tr. 772-77, 1574-1626.)  She also

saw Dr. Leb regularly in 2016 (Tr. 1340-68), treated with pain management specialists,

chiropractors, and wellness specialists at the Cleveland Clinic (Tr. 1027-44, 1044-46, 1046-51,

1061-64, 1072-75), and attended physical therapy (Tr. 781-937, Tr. 1058-61, 1064-1072).

On January 7, 2016, Ms. Daniels returned to Dr. Leb.  (Tr. 1340-43.)  She reported that

her shoulder was doing about the same; she was doing therapy exercises but said her shoulder

was not getting stronger.  (Tr. 1340.)  On examination of the right shoulder, Ms. Daniels had

tenderness to the biceps tendon / subacromial space; range of motion testing revealed elevation

to 140 degrees and external and internal rotation to 80 degrees; crepitus was not present;

supraspinatus and infraspinatus strengths were 5/5; and Neer and Hawkins signs were negative.

(Tr. 1341.)  Dr. Leb recommended that Ms. Daniels continue with physical therapy, Ibuprofen,

Voltaren gel, and pain medications prescribed by Dr. Breitenbach.  (Tr. 1342.)  He also

recommended a functional capacity evaluation once physical therapy was completed to

determine Ms. Daniels's ability to work.  (*Id*.)  During a January 20, 2016 visit with Dr.

Breitenbach, Ms. Daniels exhibited pain in the right shoulder with abduction at 90 degrees and

positive Neer and Hawkins signs.  (Tr. 775.)  At her next visit on February 2, 2016, she exhibited

pain in the right shoulder with abduction at 120 degrees and positive Neer and Hawkins signs. (Tr. 777.)  She also continued to exhibit tenderness and neck pain on examination.  (*Id.*)

On February 11, 2016, Ms. Daniels returned to Dr. Leb.  (Tr. 1344-46.)  She reported that her right shoulder was better, but not 100% better.  (Tr. 1344.)  She had pain when rolling over and lifting and heard a crackling.  (*Id.*)  She was doing home exercises after plateauing in physical therapy.  (*Id.*)  She was scheduled to a see a pain management doctor at the end of the month and was continuing to use Ibuprofen, Voltaren gel, and medications from Dr. Breitenbach. (*Id.*)  Her range of motion was 140 elevation passively to 160 degrees, 80 degrees internal and external rotation, 50 degrees of extension, and 50 degrees of crossbody; her supraspinatus and infraspinatus strength was 5/5; and Neer and Hawkins signs were positive.  (Tr. 1345.)

Ms. Daniels returned to Dr. Breitenbach on February 16, 2016.  (Tr. 1574.)  She reported pain in her neck and right shoulder was five out of ten.  (*Id.*)  On examination, she exhibited pain in the right shoulder with abduction at 110 degrees and positive Neer and Hawkins signs.  (Tr. 1575.)  She also had tenderness in her neck and increased pain with rotation of her head.  (*Id.*)

On February 23, 2016, Ms. Daniels presented to pain management specialist Maximillian Hsia, M.D., at the Cleveland Clinic for an evaluation regarding her neck and shoulder pain.  (Tr. 1072-75.)  Examination of her neck revealed severe pain in the upper back and neck, worse on the right; Spurling's test was negative; there was some loss of sensation to light touch about the lateral aspect of the right forearm; and strength was 5/5 bilaterally throughout the upper extremities.  (Tr. 1074.)  Range of motion was full and pain free in all extremities.  (*Id.*)  Dr. Hsia diagnosed cervical myofascial strain, chronic right shoulder pain, and disorder of bursae and tendons in the shoulder region.  (Tr. 1074-75.)  He recommended a TENS unit, continued use of Robaxin as prescribed, and prescribed oxaprozin.  (Tr. 1075.)

15

When Ms. Daniels returned to Dr. Breitenbach on March 1, 2016, she reported that pain management wanted to try trigger point injections and recommended a TENS unit.  (Tr. 1576.)  Neck and right shoulder examination findings were unchanged from her February 16, 2016 examination. (*Compare* Tr. 1577 *with* Tr. 1575.)

On March 10, 2016, Ms. Daniels returned to Dr. Leb.  (Tr. 1347-49.)  Range of motion for elevation was 150 degrees, internal and external rotation was 80 degrees, extension was 50 degrees, and crossbody was 50 degrees; supraspinatus and infraspinatus strength was 5/5, and Neer and Hawkins signs were positive.  (Tr. 1347-48.)

On March 15, 2016, Ms. Daniels returned to Dr. Breitenbach, reporting that she was very sore from the weather and needed refills of her pain medication and muscle relaxant.  (Tr. 1578.)  She said she was scheduled for a functional capacity evaluation in April.  (*Id.*)  On examination, she exhibited pain in the right shoulder with abduction at 90 degrees and positive Neer and Hawkins signs.  (Tr. 1579.)  She also had tenderness in her neck and increased pain with rotation of her head.  (*Id.*)

On March 30, 2016, Ms. Daniels started physical therapy at the Cleveland Clinic for her neck and right shoulder pain.  (Tr. 1069-72.)  On April 12, 2016, she returned to Dr. Leb for a right shoulder injection.  (Tr. 1350-52.)  When she returned to Dr. Leb for follow up on April 26, 2016, she reported improvement since her shoulder injection; she said she was able to get through physical therapy with no pain and was able to do more around the house.  (Tr. 1353.)  But she also reported that she thought she might have overdone it because she had increased soreness.  (*Id.*)  Her range of motion for forward elevation was 160 degrees, abduction was 150 degrees, extension was 50 degrees, cross body adduction was 40 degrees, internal rotation was

16

70 degrees, and external rotation was 80 degrees; supraspinatus and infraspinatus strength was deferred, and Neer and Hawkins signs were positive.  (Tr. 1354.)

Ms. Daniels continued to complain of pain in her right shoulder and neck during visits with Dr. Breitenbach in April 2016.  (Tr. 1582, 1485.)  She reported pain levels of four to five out of ten.  (*Id*.)  She had pain in her right shoulder with abduction at 120 degrees and positive Neer and Hawkins signs.  (Tr. 1583.)  Ms. Daniels also returned to pain management at the Cleveland Clinic in April 2016, seeing Trevor Van Oostrom, M.D.  (Tr. 1061-64.)  Examination showed: significantly reduced range of motion in the neck due to pain; tenderness over the trapezius, right greater than left; Spurling could not be assessed secondary to lack of range of motion.  (Tr. 1063.)  Peripheral joint range of motion was full and pain free without obvious instability or laxity in all four extremities.  (*Id*.)  Ms. Daniels's right shoulder was limited with internal rotation and abduction.  (*Id*.)  Her bilateral upper and lower strength was normal and symmetric with no atrophy noted.  (*Id*.)  Dr. Van Oostrom recommended: continued physical therapy, trial of a TENS unit, MRI of the right shoulder, and cervical x-ray.  (*Id*.)

Ms. Daniels continued with physical therapy at the Cleveland Clinic for six sessions through the end of April.  (Tr. 1058-61, 1064-1072.)  At her last session on April 22, 2016, Ms. Daniels reported 10% improvement in activities of daily living.  (Tr. 1058-59.)  The MRI of her right shoulder, taken on May 20, 2016, showed postoperative changes in the AC joint, fluid in the subdeltoid subacromial bursa, possibly due to bursitis, and rotator cuff tendinosis without tear.  (Tr. 1049, 1136-38.)  Her cervical spine x-ray, also taken on May 20, 2016, showed minimal degenerative changes.  (Tr. 1138.)

During visits with Dr. Breitenbach in May and June 2016, Ms. Daniels continued to complain of pain in the right shoulder and neck.  (Tr. 1586, 1588, 1590, 1592.)  During a May

17

24, 2016 appointment she also complained of increased pain in her left shoulder from overuse. (Tr. 1588.)  Examination findings in May and June were similar to findings from April, showing pain in the right shoulder with abduction between 110 and 120 degrees, positive Neer and Hawkins signs, and tenderness in the neck with increased pain with rotation.  (*Compare* Tr. 1587, 1589, 1591, 1593 *with* Tr. 1583, 1585.)  She continued to treat her pain with pain medication and muscle relaxers.  (Tr. 1587, 1589, 1591, 1593.)

Ms. Daniels returned to Dr. Leb in June 2016, reporting that she felt she was improving. (Tr. 1356-59.)  Her range of motion was 160 degrees for forward elevation actively and 170 degrees passively, 50 degrees for extension, 40 degrees for crossbody adduction, 160 degrees for abduction, and 80 degrees for external and internal rotation.  (Tr. 1356.)  Neer and Hawkins signs were positive.  (*Id*.)  Dr. Leb recommended that Ms. Daniels return to work on light duty status.  (Tr. 1358.)  Ms. Daniels also returned to pain management at the Cleveland Clinic in June 2016, seeing Samuel Samuel, M.D.  (Tr. 1048-51.)  Examination of the neck showed significantly reduced range of motion in all directions secondary to pain; tenderness over the trapezius, right greater than left.  (Tr. 1050.)  Peripheral joint range of motion was full and pain free without obvious instability or laxity in all four extremities.  (*Id*.)  Ms. Daniels's right shoulder was limited with internal rotation and abduction.  (*Id*.)  There was cracking with movement of the right shoulder and AC joint pain.  (*Id*.)  Her bilateral upper and lower strength was normal and symmetric with no atrophy noted.  (*Id*.)  Dr. Samuel said he would submit to insurance for approval an AC joint block and prescribed Cymbalta.  (Tr. 1051.)  He also encouraged use of Voltaren gel and prescribed Pennsaid 2%.  (*Id*.)

On July 1, 2016, Ms. Daniels started another course of physical therapy at NovaCare Rehabilitation for her right shoulder and cervical spine.  (Tr. 781-84.)  Range of motion testing

18

in the right shoulder was 145 degrees with flexion and 130 degrees with abduction.  (Tr. 782.)
Hawkins and Neer testing aggravated Ms. Daniels's symptoms.  (*Id*.)  Ms. Daniels also had
reduced range of motion in the cervical spine.  (*Id*.)

Ms. Daniels returned to Dr. Breitenbach on July 5, 2016, reporting she had started
physical therapy.  (Tr. 1594.)  She said she was sore after therapy, but the soreness had subsided.
(*Id*.)  Her reported pain level in her neck and right shoulder was four out of ten.  (*Id*.)  On
examination, she displayed pain with abduction at 120 degrees in the right shoulder, positive
Neer and Hawkins signs, and tenderness and pain in her neck.  (Tr. 1595.)  Ms. Daniels's
diagnoses included sprain of right rotator cuff capsule, spontaneous rupture of extensor tendons
in the right shoulder, and sprain of ligaments of cervical spine.  (*Id*.)  Dr. Breitenbach continued
to prescribe Percocet for pain.  (*Id*.)

Ms. Daniels returned to Dr. Leb on July 14, 2016.  (Tr. 1360-63.)  She said physical
therapy was helping.  (Tr. 1360.)  She also said that Dr. Breitenbach released her to light duty
work but there was no light duty work available, so she was still off work.  (*Id*.)  Examination of
the right shoulder showed tenderness in the bicipital groove and minimal crepitus with range of
motion.  (Tr. 1361.)  Range of motion testing was 160 degrees for elevation, 50 degrees for
extension, 50 degrees for adduction, and 80 degrees for external rotation.  (Tr. 1362.)
Supraspinatus and infraspinatus strength was 5/5 and Neer and Hawkins signs were positive.
(*Id*.)  Dr. Leb recommended that Ms. Daniels return to work on light duty status if available.
(*Id*.)  Ms. Daniels next saw Dr. Breitenbach on July 19, 2016.  (Tr. 1596.-97.)  Examination
findings for the neck and right shoulder were unchanged from her earlier July visit.  (*Compare*
Tr. 1597 *with* Tr. 1595.)  She continued to treat her pain with pain medication and muscle
relaxers.  (Tr. 1597.)

After several weeks of physical therapy (Tr. 782-840), Ms. Daniels showed some improvement with her range of motion and strength and lifting capacity; she was able to tolerate lifting and carrying and waist to shoulder lifting with three pounds (Tr. 836).  But her lifting and carrying ability did not meet her job demand and her strength and range of motion deficits contributed to pain and difficulty with functional activities.  (*Id.*)  At the end of July 2016, therapy was placed on hold while additional insurance authorization was sought.  (*Id.*)  Physical therapy resumed in mid-August 2016 and continued through early October 2016.  (Tr. 844-937.)

On August 11, 2016, a pain management specialist at the Cleveland Clinic administered a right acromioclavicular joint block.  (Tr. 1044-46.)  When Ms. Daniels returned to Dr. Breitenbach on August 16, 2016, she reported feeling better after receiving a cortisone injection in her right shoulder.  (Tr. 1600.)  Examination of her right shoulder revealed pain with abduction at 120 degrees and tenderness and pain in the neck.  (Tr. 1601.)  Neer and Hawkins signs were not recorded.  (*Id.*)  Dr. Breitenbach continued to prescribe pain medication and muscle relaxers.  (*Id.*)  During her next visit with Dr. Breitenbach on August 30, 2016, Ms. Daniels reported that her muscle relaxer, Robaxin, was not as effective as it had been.  (Tr. 1602.)  Dr. Breitenbach started her on tizanidine in place of Robaxin.  (Tr. 1603.)

On September 13, 2016, Dr. Breitenbach discontinued tizanidine and started Baclofen for muscle relaxation because Ms. Daniels reported tizanidine was making her sick.  (Tr. 1605-06.)  Her right shoulder examination continued to show pain with abduction at 120 degrees; Neer and Hawkins signs were positive; and tenderness and pain in the neck were noted.  (Tr. 1606.)

Ms. Daniels returned to Dr. Leb on September 15, 2016.  (Tr. 1365-68).  She reported doing better in some ways but worse in other ways.  (Tr. 1365.)  She felt her range of motion was "pretty much full but she [was] having a lot of aching pain and clicking in her shoulder with

range of motion." (*Id.*)  Her right shoulder examination revealed tenderness to the biceps tendon / subacromial space / lateral deltoid / posterior deltoid / AC joint, with crepitus episodically present in the subacromial space on range of motion testing.  (Tr. 1366.)  Range of motion testing showed: elevation to 150 degrees and to 160 degrees with help, external rotation to 80 degrees, internal rotation to 70 degrees, and extension and adduction to 50 degrees.  (*Id.*) Supraspinatus and infraspinatus strength was 5/5 and Neer and Hawkins signs were positive. (*Id.*)  Dr. Leb continued to recommend that she return to work on light duty if available.  (*Id.*)

On September 27, 2016, Ms. Daniels saw Dr. Breitenbach and reported that she was feeling achy with a lot of spasms.  (Tr. 1608.)  She was still doing physical therapy.  (*Id.*)  She reported her neck and right shoulder pain level was a five out of ten.  (*Id.*)  Neck and right shoulder examination findings were unchanged.  (*Compare* Tr. 1609 *with* Tr. 1606.)

Ms. Daniels was discharged from physical therapy in October 2016 after completing thirty sessions and reaching a plateau in her progress.  (Tr. 935, 937.)  At discharge, she had not met her goal of being able to complete demands of heavy workload.  (Tr. 935-36.)  She rated her pain level at a four out of ten.  (Tr. 936.)  She was able to complete "shelf lift" with a two-pound weight for a three-minute period but she had pain through her neck and right shoulder afterward. (*Id.*)  She was able to push/pull eighty pounds with pain noted throughout the lumbar spine.  (*Id.*) She could lift and carry a five-pound box.  (*Id.*)  She showed improvement in her right shoulder range of motion, but she continued to show "pain with resisted MMT for [right] shoulder flexion and abduction" and a "positive response to impingement testing at [right] shoulder."  (*Id.*)

When Ms. Daniels returned to Dr. Breitenbach in October 2016, she reported that the pain in her neck and right shoulder was a four out of ten.  (Tr. 1610, 1613.)  Her examination findings remained unchanged from September.  (*Compare* Tr. 1611, 1614 *with* Tr. 1606, 1609.)

Dr. Breitenbach continued to prescribe pain medication and muscle relaxers.  (Tr. 1611, 1614.)
Ms. Daniels's diagnoses included: sprain of right rotator cuff capsule; spontaneous rupture of
extensor tendons in the right shoulder; sprain of ligaments of cervical spine; strain of muscle,
fascia and tendon at the neck level; and contusion of the right shoulder.  (*Id.*)

On November 8, 2016, Ms. Daniels reported to Dr. Breitenbach that she was having a lot
of spasms at night in her neck.  (Tr. 1616.)  She reported that pain in her neck and right shoulder
was five out of ten, and she was planning on seeing an orthopedist regarding possible fusion in
the right shoulder.  (*Id.*)  Examination of the right shoulder continued to show pain with
abduction at 120 degrees and positive Neer and Hawkins signs.  (*Id.*)

At her December 20, 2016 visit with Dr. Breitenbach, Ms. Daniels reported that pain
management recently diagnosed her with fibromyalgia.  (Tr. 1625.)  She reported that the pain in
her neck and right shoulder was five out of ten.  (*Id.*)  Examination of her right shoulder
continued to show pain with abduction at 120 degrees and positive Neer and Hawkins signs, and
examination of the neck continued to show tenderness.  (Tr. 1626.)  Dr. Breitenbach continued to
prescribe pain medication and muscle relaxers.  (*Id.*)

*2017*

Ms. Daniels continued treating regularly with Dr. Breitenbach throughout 2017.  (Tr.
1631-39, 2469-2530.)  She also saw Dr. Leb in 2017 (Tr. 1369-72), and she continued to see
various providers at the Cleveland Clinic during 2017 for treatment relating to her chronic pain
(*see, e.g.*, Tr. 1020-23, 1715-26, 1730-48, 1808-14, 1817-22, 2046-52, 2365-86, 2278-80).

On January 12, 2017, Ms. Daniels presented to Eric Ricchetti, M.D., at the Cleveland
Clinic for evaluation of her ongoing complaints of neck and shoulder pain.  (Tr. 1020-23.)
Range of motion testing of Ms. Daniels's right shoulder showed: passive forward elevation to

22

170 on the right as compared to 170 on the left; active forward elevation to 160-170 on the right as compared to 170 on the left; passive external rotation at the side to 60 on the right as compared to 60 on the left; and active internal rotation was to the mid-thoracic levels on the right as compared to the mid-thoracic levels on the left.  (Tr. 1023.)  Strength testing of the rotator cuff was 5/5 with resisted external rotation at the side and 5/5 strength with resisted Jobe's maneuver but with pain with resisted Jobe's maneuver.  (*Id.*)  There was pain with impingement maneuvers but no pain at end-range motion.  (*Id.*)  There was tenderness to palpation in the neck and shoulder.  (*Id.*)  After recounting Ms. Daniels's surgical and non-surgical treatment history and responses to those treatments, Dr. Richhetti concluded that he did not think that Ms. Daniels would benefit from additional surgical intervention.  (Tr. 1023.)  He recommended continued non-operative management, consisting of activity modification, use of anti-inflammatories, cortisone injections, and physical therapy.  (*Id.*)

On January 18, 2017, Ms. Daniels returned to Dr. Breitenbach, complaining she was "super stiff and sore"; she rated her shoulder, neck, and back pain at seven out of ten.  (Tr. 1631.)  Examination of her right shoulder revealed pain with abduction at 120 degrees and positive Neer and Hawkins signs; there was tenderness and pain in her neck.  (Tr. 1632.)  Dr. Breitenbach refilled her pain medication and muscle relaxer.  (*Id.*)  When Ms. Daniels presented to Dr. Leb the next day for follow up regarding her right shoulder, she reported doing well.  (Tr. 1369-72.)  She said she continued to have crepitation with movement, and every so often heard a "pop."  (Tr. 1369.)  There was no tenderness on examination, but there was crepitus on range of motion testing.  (Tr. 1370.)  Range of motion testing showed forward elevation and abduction to 160 degrees, extension to 60 degrees, and external and internal rotation to 80 degrees.  (*Id.*)

Supraspinatus and infraspinatus strength was 5/5 and Hawkins and Neer signs were negative. (Tr. 1371.)  Dr. Leb recommended return to work on light duty status if available.  (*Id.*)

On February 14, 2017, Ms. Daniels returned to Dr. Breitenbach, reporting her pain level was five out of ten.  (Tr. 1637.)  She reported taking two Percocet at a time because she felt they were not working as well, and she inquired about a higher dose of Percocet.  (*Id.*)  Examination of Ms. Daniels's right shoulder revealed pain with abduction at 90 degrees and tenderness in the neck.  (Tr. 1638.)  Neer and Hawkins signs were positive.  (*Id.*)

When Ms. Daniels returned to Dr. Breitenbach on February 28, 2017, she reported attending a holistic pain management class that she felt was helping.  (Tr. 2528.)  Her reported pain level was a five out of ten.  (*Id.*)  Examination of Ms. Daniels's right shoulder revealed pain with abduction at 120 degrees and tenderness in the neck.  (Tr. 2529.)  Neer and Hawkins signs were positive.  (*Id.*)  There were no changes when Ms. Daniels returned to Dr. Breitenbach in March 2017.  (Tr. 2525-26.)  On April 4, 2017, Ms. Daniels saw Dr. Breitenbach and reported her pain was a four out of ten.  (Tr. 2522.)  Examination of Ms. Daniels's right shoulder revealed pain with abduction at 120 degrees and tenderness in the neck.  (Tr. 2523.)  Neer and Hawkins signs were positive.  (*Id.*)  Dr. Breitenbach refilled Ms. Daniels's prescriptions.  (*Id.*)

Ms. Daniels's reported a pain level of five out ten when she saw Dr. Breitenbach on May 2 and 16, 2017.  (Tr. 2513, 2516.)  Her examination findings were unchanged from April 2017. (*Compare* Tr. 2514, 2517 *with* Tr. 2520, 2523.)  At her May 30, 2017 appointment, she exhibited pain in the right shoulder with abduction at 110 degrees and positive Neer and Hawkins signs. (Tr. 2511.)  When she saw Dr. Breitenbach in June 2017, she reported a pain level of four out of ten.  (Tr. 2504, 2507.)  Her right shoulder examination revealed pain with abduction at 120 degrees and positive Neer and Hawkins signs; her neck was tender.  (Tr. 2505, 2508.)

On July 25, 2017, Ms. Daniels reported to Dr. Breitenbach that the pain level in her neck and shoulder was a six out of ten.  (Tr. 2498.)  On examination, she exhibited pain in her right shoulder with abduction at 100 degrees and positive Neer and Hawkins signs.  (Tr. 2499.)  Dr. Breitenbach continued Ms. Daniels's pain medication and muscle relaxer.  (*Id.*)  During appointments with Dr. Breitenbach in August 2017, Ms. Daniels continued to report her pain was a six out of ten.  (Tr. 2492, 2495.)  On examination of her right shoulder, she exhibited pain with abduction at 110 and 120 degrees and positive Neer and Hawkins signs.  (Tr. 2493, 2496.)

Ms. Daniels returned to Dr. Breitenbach on September 6, 2017, with reported pain levels and examination findings similar to her August appointments.  (Tr. 2489-90.)  When she returned on September 19, 2017, her reported pain in her neck had increased to seven out of ten. (Tr. 2486.)  Her examination revealed tenderness and pain in the neck, and pain in the right shoulder with abduction at 135 degrees.  (Tr. 2487.)  Neer and Hawkins signs were positive. (*Id.*)  Dr. Breitenbach continued Percocet for pain and Baclofen for muscle relaxation.  (*Id.*)

Ms. Daniels returned to Dr. Breitenbach on October 4, 2017, reporting that she was recently in the hospital due to depression.  (Tr. 2483.)  She reported that pain in her right shoulder and neck was a seven out of ten.  (*Id.*)  Examination of the neck revealed tenderness. (Tr. 2484.)  There were no examination findings of the right shoulder recorded at the visit.  (*Id.*) Ms. Daniels saw Dr. Breitenbach again on October 17, 2017.  (Tr. 2480.)  She had been informed that her workers compensation claim was being denied; her private insurance was therefore being billed for her office visits.  (*Id.*)  She continued to report neck and right shoulder pain, with a reported pain level of six out ten.  (*Id.*)  Examination revealed tenderness in the neck and pain in the right shoulder with abduction at 135 degrees.  (Tr. 2481.)  Neer and Hawkins signs were positive.  (*Id.*)  When she returned to Dr. Breitenbach on October 31, 2017, her pain

level was unchanged.  (Tr. 2478.)  Examination showed tenderness in the neck, pain in the right shoulder with abduction at 110 degrees, and positive Neer and Hawkins signs.  (Tr. 2479.)

When Ms. Daniels saw Dr. Breitenbach for visits in November 2017, she continued to report a pain level of six out of ten.  (Tr. 2472, 2475.)  Examinations continued to reveal tenderness in the neck, pain in the right shoulder with abduction at 120 degrees, and positive Neer and Hawkins signs.  (Tr. 2473, 2476.)

Ms. Daniels returned to Dr. Breitenbach on December 12, 2017, complaining of pain that radiated down her right shoulder.  (Tr. 2469.)  Her reported pain level was a six out of ten.  (*Id*.) She recently found out she was pregnant and had stopped all medications except Tylenol, which caused withdrawal and night sweats.  (*Id*.)  Her examinations continued to reveal tenderness in the neck, pain in the right shoulder with abduction at 120 degrees, and positive Neer and Hawkins signs.  (Tr. 2470.)  Ms. Daniels's diagnoses included: spontaneous rupture of extensor tendons in the right shoulder; sprain of right rotator cuff capsule; strain of other muscles, fascia and tendons at shoulder and upper arm, left arm; and sprain of other specified parts of unspecified shoulder girdle.  (*Id*.)

*2018*

Ms. Daniels continued treating regularly with Drs. Breitenbach in 2018.  (Tr. 2461-68, 2748-80.)  She also presented to rheumatologist Linda Mileti, M.D., at the Cleveland Clinic in July 2018 for evaluation regarding her shoulder and back pain.  (Tr. 2728-46.)

During her visits with Dr. Breitenbach in January and February 2018, Ms. Daniels continued to report pain and her examinations continued to reveal tenderness in her neck, pain in the right shoulder with abduction at varying degrees, and positive Neer and Hawkins signs.  (Tr. 2461-65.)  She was only taking Tylenol for her pain, due to her pregnancy.  (Tr. 2461.)

26

When she returned to Dr. Breitenbach on March 28, 2018, she reported pain in her neck and right shoulder that she rated a six out of ten.  (Tr. 2748.)  She said she needed a functional capacity evaluation for social security disability.  (*Id*.)  Her examination continued to reveal tenderness in the neck, pain in the right shoulder with abduction at 110 degrees, and positive Neer and Hawkins signs.  (Tr. 2749.)  Ms. Daniels's baby was born in May 2018.  (Tr. 2728.)

On June 28, 2018, Ms. Daniels returned to Dr. Breitenbach, complaining of intolerable, but fluctuating, pain that she rated a nine out of ten.  (Tr. 2750.)  She indicated that she was not breastfeeding and wanted something for her pain and a muscle relaxant.  (*Id*.)  On examination, Dr. Breitenbach noted tenderness in the neck and pain in the right arm with abduction at 90 degrees.  (Tr. 2751.)  He prescribed Percocet and Baclofen.  (*Id*.)

Ms. Daniels returned to Dr. Breitenbach on July 17, 2018.  (Tr. 2753.)  She reported that her neck and right shoulder pain was a seven out of ten.  (*Id*.)  She requested a refill of her Percocet and she asked to change her muscle relaxant from Baclofen to Flexeril.  (*Id*.)  Examination showed tenderness in the neck, pain in the right arm with abduction at 110 degrees, and positive Neer and Hawkins signs.  (Tr. 2754.)  Dr. Breitenbach refilled Ms. Daniels's Percocet and prescribed Flexeril.  (*Id*.)

That same day, Ms. Daniels also saw rheumatologist Dr. Mileti at the Cleveland Clinic.  (Tr. 2728.)  Ms. Daniels reported a diagnosis of fibromyalgia and said she had chronic pain.  (*Id*.)  She was seeking confirmation of the fibromyalgia diagnosis and assistance with pain management.  (*Id*.)  On examination, Ms. Daniels's neck was nontender.  (Tr. 2732.)  Her active abduction in the right shoulder was limited to 90 degrees; and her passive abduction in the right shoulder was about 120 degrees.  (*Id*.)  There was diffuse tenderness to palpation throughout the spine, vertebrae, and soft tissues.  (*Id*.)  She exhibited 5/5 strength throughout.  (*Id*.)  Dr. Mileti

agreed with the fibromyalgia diagnosis, noting there was no evidence of inflammatory arthritis.
(Tr. 2733.)  She advised Ms. Daniels on the importance of restorative sleep and regular exercise.
(*Id*.)  She also recommended that Ms. Daniels speak with her psychiatrist and primary care
physician about switching or adding some medication; she also recommended physical therapy
for the fibromyalgia diagnosis, back pain, and tendinopathy of the rotator cuff.  (*Id*.)

When Ms. Daniels returned to Dr. Breitenbach on July 31, 2018, she continued to
complain of right shoulder and neck pain.  (Tr. 2756.)  She reported that her pain was a five out
of ten.  (*Id*.)  On examination, she continued to exhibit tenderness in the neck and pain in right
shoulder with abduction at 90 degrees.  (Tr. 2757.)

Ms. Daniels returned to Dr. Breitenbach on August 14, 2018, reporting that her pain level
was a four out of ten.  (Tr. 2759.)  She felt her medications were helping and requested refills.
(*Id*.)  Examination revealed tenderness in the neck, increased pain with rotation of her head to the
right or left, pain in the right shoulder with abduction at 90 degrees, and positive Neer and
Hawkins signs.  (Tr. 2760.)  Dr. Breitenbach provided medication refills.  (*Id*.)  When Ms.
Daniels returned to Dr. Breitenbach on August 28, 2018, her examination revealed pain in the
right shoulder with abduction at 110 degrees.  (Tr. 2762-63.)  Neer and Hawkins signs were
positive.  (Tr. 2763.)  The following month, on September 11, 2018, her right shoulder
examination findings were unchanged.  (*Compare* Tr. 2765 *with* Tr. 2763.)   On September 25,
2018, Ms. Daniels reported her pain was a five out of ten.  (Tr. 2767.)  Her neck examination
revealed tenderness and examination of her right shoulder revealed pain with abduction at 100
degrees and positive Neer and Hawkins signs.  (Tr. 2768.)

When she returned to Dr. Breitenbach on October 9, 2018, her reported pain level
remained a five out of ten and her neck and right shoulder examinations were unchanged.  (Tr.

2769-70.)  On October 23, 2018, Ms. Daniels continued to report that her pain level was a five out of ten.  (Tr. 2771.)  Examination of her neck revealed tenderness and increased pain with rotation of her head to the left or right.  (Tr. 2772.)  Examination of her right shoulder revealed pain in the with abduction at 90 degrees and positive Neer and Hawkins signs.  (*Id*.)

Ms. Daniels returned to Dr. Breitenbach on November 6, 2018.  (Tr. 2773.)  She continued to report pain in her right shoulder and neck, with a pain level of six out ten.  (*Id*.)  Her examination continued to reveal tenderness in the neck, pain in the right shoulder with abduction at 120 degrees, and positive Neer and Hawkins signs.  (Tr. 2774.)  Dr. Breitenbach continued to prescribe pain medication and a muscle relaxer.  (*Id*.)  A few weeks later, on November 20, 2018, Ms. Daniels continued to report a pain level of a six out of ten.  (Tr. 2775.)  Examination of her right shoulder revealed pain with abduction at 110 degrees and positive Neer and Hawkins signs.  (Tr. 2776.)  On December 4, 2018, Ms. Daniels reported her pain level was five out ten.  (Tr. 2777.)  She continued to show tenderness in her neck on examination, pain in her right shoulder with abduction at 100 degrees, and positive Neer and Hawkins signs.  (Tr. 2778.)  A few weeks later, on December 18, 2018, Ms. Daniels reported that her pain was a six out of ten.  (Tr. 2779.)  Examination revealed tenderness in the neck, pain in the right shoulder with abduction at 95 degrees, and positive Neer and Hawkins signs.  (Tr. 2780.)  Dr. Breitenbach continued Ms. Daniels's pain medication and muscle relaxant.  (*Id*.)  Ms. Daniels's diagnoses included: sprain of the right rotator cuff capsule; strain of other muscles, fascia, and tendons at the shoulder; and spontaneous rupture of extensor tendons in the right shoulder.  (*Id*.)

29

## 2. Opinion Evidence

### i. Treating Source

Dr. Breitenbach provided three medical opinions, completed in 2016, 2018, and 2020.[4] (Tr. 970, 2353-54, 3609-10.)

On December 6, 2016, Dr. Breitenbach completed a U.S. Department of Labor "Duty Status Report" form, indicating Ms. Daniels was diagnosed with right shoulder/cervical strain as a result of her December 24, 2012 injury. (Tr. 970.) Dr. Breitenbach opined that the only work-related activities associated with Ms. Daniels's postal service job that she could perform were sitting and driving for three hours each day. (*Id.*) As to all other work-related activities, including the ability to lift and or carry items and reach above the shoulder, Dr. Breitenbach opined that Ms. Daniels could not perform those activities for any amount of time. (*Id.*)

On March 19, 2018, Dr. Breitenbach completed a "Medical Source Statement: Patient's Physical Capacity," opining as to Ms. Daniels's ability to perform work-related activities. (Tr. 2353-54.) He opined that Ms. Daniels could occasionally lift and carry five pounds due to right shoulder sprain. (Tr. 2353.) He opined that she could frequently push and pull, perform fine and gross manipulation, and reach with the left arm only due to right shoulder sprain. (Tr. 2353-54.) He opined that Ms. Daniels: was not limited in her ability to stand, walk, or sit; could rarely climb or crawl; and could occasionally balance, stoop, crouch, and kneel. (Tr. 2353.) He noted that Ms. Daniels used a TENS unit. (Tr. 2354.) He opined that Ms. Daniels experienced severe pain, but that her pain would not interfere with her concentration, take her off task, or cause absenteeism and she would not need additional unscheduled rest periods. (*Id.*)

---

[4] All three opinions are summarized herein. The Court notes that the 2020 opinion post-dates Ms. Daniels's date last insured, which was December 31, 2018. (*See* Tr. 2892.)

On December 1, 2020, Dr. Breitenbach completed a "Medical Source Statement: Patient's Physical Capacity," opining as to Ms. Daniels's ability to perform work-related activities.  (Tr. 3609-10.)  Dr. Breitenbach opined that she could occasionally lift and carry five pounds, but not above the shoulder level due to an MRI showing spontaneous rupture of extension tendons in the right shoulder.  (Tr. 3609.)  He opined that she was not limited in her ability to stand, walk, or sit, but noted that she would experience fatigue of the right shoulder and neck.  (*Id*.)  He opined that Ms. Daniels could rarely climb or crawl and could occasionally balance, stoop, crouch, and kneel.  (*Id*.)  Due to her right shoulder impairment, he opined that she could: never reach, push, or pull; rarely perform gross manipulation; and occasionally perform fine manipulation.  (Tr. 3610.)  He opined that Ms. Daniels experienced severe pain that would not interfere with her concentration or take her off task, but that her pain would cause absenteeism.  (*Id*.)  He also opined that she would need additional unscheduled rest periods of two to three hours during the workday.  (*Id*.)  He further opined that Ms. Daniels's reduced range of motion in her neck would interfere with her ability to perform work on a full-time basis.  (*Id*.)

### ii.  State Agency Medical Consultants

On March 13, 2017, state agency medical consultants Yeshwanth Bekal, M.D., completed an RFC.  (Tr. 148-50.)  Dr. Bekal opined that Ms. Daniels could: stand and/or walk for six hours; sit for six hours; lift and/or carry ten pounds or less; and occasionally push and/or pull with her right upper extremity.  (Tr. 148.)  He explained that she was limited in lifting or carrying due to her chronic right upper extremity limitations, limited range of motion, strength, and neck injury.  (*Id*.)  Dr. Bekal also opined that Ms. Daniels was limited to occasional front and lateral reaching with the right upper extremity and no overhead reaching with the right upper extremity.  (Tr. 149.)  Dr. Bekal further opined that Ms. Daniels: could never climb ladders,

ropes, or scaffolds; could frequently crawl; and should avoid even moderate exposure hazards such as unprotected heights, open machinery, and commercial driving.  (Tr. 149-50.)

Upon reconsideration on July 10, 2017, state agency medical consultant William Bolz, M.D., completed an RFC.  (Tr. 163-66.)  Dr. Bolz affirmed Dr. Bekal's RFC findings. (*Compare* Tr. 163-66 *with* Tr. 148-50.)

### iii.    Medical Expert

At the March 21, 2023 hearing, Steven A. Golub, M.D., testified and provided his opinion regarding Ms. Daniels's impairments and residual functional capacity.  (Tr. 2998-3005.) He said Ms. Daniels was diagnosed with rotator cuff tendonitis and impingement following a workplace injury to her right shoulder.  (Tr. 3001.)  He noted that the record showed Ms. Daniels missed pain management appointments on multiple occasions at a time when the record reflected a significant history of drug abuse.  (*Id*.)  He also acknowledged that there were other diagnoses mentioned in the record, including fibromyalgia, chronic fatigue, and myofascial strain.  (*Id*.) When Ms. Daniels resumed treatment for her right shoulder in February 2018, Dr. Golub said the record reflected she was diagnosed with a sprain, which appeared to be her right shoulder diagnosis through December 31, 2018, the end of the relevant time period.  (Tr. 3000, 3001.)

Dr. Golub opined that Ms. Daniels's impairments separately or in combination did not meet or equal an impairment described in the listings of impairments.  (Tr. 3002.)  But he opined that there were limitations caused by her impairments, stating:

> I think the main functional issue would be with regard to lifting at the site of the right appendage, the right shoulder, and I think that would limit it to occasional overhead, less than five pounds, an[d] occasional . . . [for other] directions but without as much weight restriction in the other directions as it would have been straight overhead.

(Tr. 3002.)  He opined that Ms. Daniels would not have limitations in handling and fingering unless she had to reach up onto a shelf to perform a handling or fingering task.  (Tr. 3003.)

### iv.  Independent Medical Examination

On October 23, 2017, Catherine Watkins Campbell, M.D., M.P.H., CIME, completed an independent medical examination ("IME") (Tr. 446-52) in connection with Ms. Daniels's workers compensation claim (Tr. 435-54).  Dr. Campbell noted that the allowed medical conditions included: sprain of ligaments of cervical spine; contusion scalp and neck; sprain of shoulder and upper arm, rotator cuff, right; sprain of shoulder and upper arm other specified sites, right; contusion of shoulder region, right; sprain of shoulder and upper arm, supraspinatus, right; and disorder of bursae and tendons in shoulder region unspecified right.  (Tr. 446.)  Dr. Campbell opined that Ms. Daniels's score of 30/45 in response to a Short-Form McGill Pain Questionnaire, which is designed to assess an individual's emotional and psychological response to their pain, indicated "extreme tendencies towards symptom amplification."  (Tr. 448.)

Ms. Daniels's physical examination showed: a cervical range of motion of 40 degrees flexion, 2 degrees extension, 60 degrees right rotation, 40 degrees left rotation, 25 degrees right lateral flexion, and 60 degrees left lateral flexion.  (Tr. 450.)  Her active range of motion in the right shoulder measured: 155, 120, and 110 degrees of abduction; 40, 40, and 35 degrees of adduction; 128, 128, and 120 degrees of flexion; 50, 51, and 45 degrees of extension; 54, 49, and 54 of internal rotation; and 75, 73, and 77 degrees of external rotation.  (Tr. 450-51.)  There was grade 4/5 weakness with shoulder adduction on the right.  (Tr. 451.)  There was diffuse midline paraspinal mid-thoracic tenderness without spasm; mild spasm in the right upper trapezius muscle; diffuse right shoulder joint tenderness; no laxity in the shoulders; occasional crepitus

with range of motion in the right shoulder; right shoulder protracted forward somewhat; and normal reflexes in the upper extremities.  (*Id.*)

Upon consideration of the allowed conditions, Ms. Daniels's history and provided records, physical examination, evaluation of the cumulative data including observations made of Ms. Daniels, Dr. Campbell opined that that "the total permanent partial impairment rating" in the claim was a 12% right upper extremity impairment.  (Tr. 451.)

## C.    Administrative Hearing Testimony and Adult Function Report

Plaintiff's testimony from her four administrative hearings and the statements she made in an Adult Function Report are summarized below.  Also summarized below is the Vocational Expert's testimony from the most recent administrative hearing, which was held on March 21, 2023.  The testimony and opinions of medical expert Dr. Golub, who testified at the March 21, 2023 administrative hearing, were summarized in Section II.B.2.iii., *supra*.

### 1.    Plaintiff's Adult Function Report

In a 2017 Adult Function Report (Tr. 377-80, 382-85),[5] Ms. Daniels reported sharing cooking responsibilities with her family, noting that she usually prepared meals three times a week.  (Tr. 383.)  She also reported doing laundry, dusting, sweeping, and mopping, but noted that she tried to get all her household chores completed once a week; then she would medicate and sleep.  (*Id.*)  She said she needed help and encouragement to get housework completed.  (*Id.*)  She no longer engaged in physical activities and stopped teaching Sunday school since her injury.  (Tr. 384.)  She said she only had two friends and did not socialize often.  (Tr. 378.)  But she did go out to dinner with family and friends to celebrate special occasions.  (Tr. 384, 378.)  She also reported going to her children's schools and attending doctors' appointments.  (Tr. 348.)

---

[5] The Adult Function Report is contained in two separate Exhibits—Exhibits 4E & 5E—with the pages slightly out of order. (Tr. 376-35.)

She said she was "just doing what [she] [had] to" (*id*.) and what was necessary to get her children to and from school and to her doctor appointments (Tr. 379).

Ms. Daniels reported using a TENS unit since April 2016, which was prescribed by her doctor.  (Tr. 385.)  She used it as needed.  (*Id*.)  She took care of her children with the help of her husband; her daughter also helped.  (Tr. 377.)  With respect to managing her personal care, Ms. Daniels said she did not need assistance shaving, feeding herself, or using the restroom.  (*Id*.)  At times it hurt to put a shirt on over her head, she needed help washing her back because she had limited ability to reach with her right arm, and her shoulders got tired and achy at times when taking care of her hair.  (*Id*.)  She also reported that: she could only lift between five and seven pounds; lifting, squatting, bending, walking, kneeling, and climbing hurt her back and neck; repetitive reaching overhead affected her shoulder and neck; and standing and walking for more than a few hours caused spasms. (Tr. 378.)

Ms. Daniels was able to drive herself and went out alone, but when she drove, she said she used a full seat massager and back up camera.  (Tr. 379.)  She shopped for groceries and other items weekly or biweekly in stores and on her computer for an hour or two.  (*Id*.)

### 2.    Plaintiff's Testimony

#### i.    June 27, 2018 Hearing

At the June 27, 2018 hearing, Ms. Daniels testified in response to questioning by the ALJ and her representative.  (Tr. 57-85.)  She lived with her husband, her older daughter when she was home from college, and her four minor children / stepchildren who were ages thirteen, ten, eight, and five weeks old.  (Tr. 58-59.)  She was right-handed and drove occasionally.  (Tr. 60.)  She had no restrictions on her driver's license but noted there were precautions due to the

medications she took.  (*Id.*)  Her husband worked as a barber part-time and was available to assist her during the day.  (Tr. 60-61.)

Ms. Daniels said she had never recovered from her work injury in 2012 and had not been able to work since that injury.  (Tr. 62, 64-65.)  She had been treating with Dr. Breitenbach since her injury.  (Tr. 84.)  She explained that her injury led to chronic pain and multiple procedures, surgeries, and injections, with one injection resulting in the need to seek emergency medical treatment.  (Tr. 64-65.)  Her injury also led to chronic fatigue and a myofascial syndrome of the neck that "spiraled into depression and anxiety."  (Tr. 65, 76-77.)  She felt her chronic fatigue and depression affected her ability to sleep through the night, which in turn affected her ability to work because she ended up napping and/or sleeping five to six hours during the day.  (Tr. 77.)  She said her pain was mostly located in her neck, back, and right shoulder, and she sometimes had pain in her hips, thighs, and arms.  (Tr. 65.)  At times her feet felt like they were being electrocuted when she stepped out of bed in the morning.  (*Id.*)  She said she had a lot of muscle spasms, which caused headaches that turned into migraines at least two or three times each week.  (Tr. 65, 75-76.)  She also reported that there were times when her migraines caused her to be in bed for days.  (Tr. 65, 75.)  She reported feeling pain all over her body at times, which felt like she had the flu.  (Tr. 65.)  She felt pain bilaterally in her arms and shoulders, but the pain was worse on the right.  (*Id.*)  She reported difficulty reaching overhead with both her arms and also difficulty reaching out in front and to the side with her right arm.  (Tr. 78-79, 84.)  As between reaching overhead and out front, Ms. Daniels reported that reaching overhead was more difficult for her.  (Tr. 84.)  Reaching overhead was painful for her.  (Tr. 78.)  At times when she reached out to the side with her right arm, she had spasms and her shoulder popped.  (Tr. 78-79.)

36

Ms. Daniels said that she had not been able to take pain medication during her most recent pregnancy, so she ended up trying "holistic procedures" such as meditation, ice, heat, and TENS unit to treat her pain. (Tr. 65-68.) She used her TENS unit twice a day, five times a week. (Tr. 79.) She reported that the TENS unit helped with her back pain, but not her overall pain. (*Id.*) Since she was no longer pregnant, she reported she was scheduled to a see a rheumatologist who specialized in fibromyalgia and chronic pain. (Tr. 66.)

Ms. Daniels said she was able to carry her newborn but not for long periods, and it hurt when she did. (Tr. 69.) She said she was able to take care of herself and that her other children were pretty self-sufficient. (Tr. 71.) Family members helped her take care of the baby and with doing chores at home. (Tr. 69-70, 71-72.) She and her husband both cooked. (Tr. 72-73.) If she washed the dishes, she usually asked her children to put them away. (Tr. 72.) Her husband did the yardwork. (Tr. 72-73.) She did the laundry, but her husband and children carried the laundry up and down the stairs. (Tr. 73-74.)

### ii. June 14, 2019 Hearing

At the June 14, 2019 hearing, Ms. Daniels testified in response to questioning by the ALJ and her representative. (Tr. 98-126.) Ms. Daniels's living situation was unchanged from the time of her prior hearing, and she was still not working. (Tr. 99-100, 101.) Her driver's license had lapsed and was suspended. (100-01.)

Ms. Daniels explained that she had not been able to work since her work injury, stating:

I had an accident at work . . . [a]nd several consequential surgeries, and I'm in a lot of pain for the majority of the time. And I have limitations like lifting and carrying things. And I have a lot of spasms throughout my back, shoulder, that happen at various times of the day and night.

I have a hard time sleeping. And then during the day, I sleep a lot. Take at least two naps most days. And then I have a hard time concentrating and working through some childhood issues with the therapist.

37

(Tr. 102.)  To treat her pain, she took several medications, used a TENS unit most nights, and used an ice pack almost every night.  (Tr. 103.)  Ms. Daniels reported that her doctor felt that she had fibromyalgia given the amount of pain she was in, but her doctor ordered an MRI of her lower back and was referring her to a spine institute to rule out other conditions.  (*Id.*)

Ms. Daniels's college-age daughter was home for the summer; she and Ms. Daniels's fourteen-year-old helped a lot with caring for her infant daughter.  (Tr. 104.)  Her husband was still working as a barber.  (*Id.*)  He was able to set his own hours and had flexibility to help at home when needed.  (Tr. 104-05.)  But Ms. Daniels also took care of her infant daughter by feeding, bathing, and diapering her.  (Tr. 108.)  Ms. Daniels said she did not go to the grocery store alone because she could not lift groceries, and because she needed help getting her baby in and out of the car seat and cart at the grocery store.  (Tr. 113-14.)  She said she could lift her infant daughter from the floor, but usually did not do so because it hurt.  (Tr. 114.)  Another family member usually picked her daughter up for her and she held her daughter on her left side.  (*Id.*)  If Ms. Daniels lifted her infant daughter, she did so with her left hand.  (Tr. 114-15.)

### iii.  January 6, 2021 Hearing

At the January 6, 2021 hearing, Ms. Daniels testified in response to questioning by the ALJ and her representative.  (Tr. 3021-27.)  She reported injuring her right shoulder, part of her neck, and her right arm while working in December 2012.  (Tr. 3021.)  Prior to December 2018, her date last insured, she had right shoulder rotator cuff surgery and a separate debridement surgery.  (*Id.*)  She said that the surgeries did not help with her right shoulder problems, and she was unable to use her right arm for "anything significant"; she tried to only use her left arm.  (*Id.*)  She was unable to reach overhead with her right arm without pain, and she could not hold her arm straight out in front without pain.  (Tr. 3021-22.)  She was able to open a doorknob, pick

up change from a table, and use a computer keyboard with her right hand (Tr. 3022, 3024), but she could not carry a bag of groceries or reach up to brush her hair with her right hand (Tr. 3022). She estimated she could lift about two to three pounds with her right arm and hand. (*Id.*) She reported attending physical therapy and pain management, and said she had two cervical injections and a cortisone injection and "blocker" in her shoulder. (Tr. 3023-24.)

The ALJ questioned Ms. Daniels regarding termination of her Workers Compensation benefits. (Tr. 3024-25.) In response, Ms. Daniels indicated she did not know why those benefits stopped, saying she thought she just "switched over to retirement like disability retirement." (*Id.*) The ALJ then pointed to records indicating that Ms. Daniels was investigated for Workers Compensation fraud and noted that her Worker's Compensation benefits were terminated in January 2017. (Tr. 3024-25.) The ALJ also noted that the records from the Department of Labor indicated that Ms. Daniels exhibited "extreme tendencies towards symptom amplification" and "reported a right upper extremity impairment of only 12%." (Tr. 3025.) The ALJ then allowed Ms. Daniels's attorney the opportunity to question Ms. Daniels on the issue. (*Id.*) In response to her counsel's questioning, Ms. Daniels admitted that she was investigated by Workers Compensation. (Tr. 3025.) She acknowledged that she was charged with falsification, but also indicated that those charges did not impede her ability to receive disability from the United States Post Office based on impairments with her right shoulder and neck. (Tr. 3025-26.)

### iv.    March 21, 2023 Hearing

At the March 21, 2023 hearing, Ms. Daniels testified in response to questioning by the ALJ and her representative. (Tr. 2991-98, 3005.) She said she stopped working in 2012 when she was injured on the job at the Post Office. (Tr. 2991-92.) She explained that she was fixing a

big metal shelf with heavy packages when it fell, hitting her neck and shoulder.  (Tr. 2992.)   Her symptoms following the injury included pain, spasms, headaches, sleepiness, and fatigue.  (*Id.*)

With respect to her right upper extremity, she said she was unable to use it functionally on a consistent basis.  (Tr. 2992.)  She relied heavily on her left arm as a result, and eventually started to have pain in her left arm.  (*Id.*)  She could not consistently reach overhead or out with her right arm without pain.  (Tr. 2992-93.)  She could carry a small purse weighing less than two pounds on her right side to give her left shoulder a break, and she could occasionally use her right hand to hold a pen or fasten buttons, but not without pain.  (Tr. 2993.)  She used her right hand for keyboarding only occasionally.  (*Id.*)  If she drove a car, she used the backup camera instead of turning around and always used a seat massager that generated heat.  (*Id.*)  During the relevant time period, she saw Dr. Breitenbach regularly—every two weeks—for treatment.  (Tr. 2993.)  She saw other physicians as well, had two shoulder surgeries, attended physical therapy and pain management, had pain block injections, and used a TENS unit.  (Tr. 2993-94.)  She had to visit the emergency on occasion due to the amount of pain she experienced.  (Tr. 2994.)

Ms. Daniels said her neck problems caused spasms and chronic headaches.  (Tr. 2994.)  She treated with a neurologist and headache specialist, tried acupuncture and chiropractic treatments, and took medications.  (*Id.*)  If she tried to turn her head while driving to turn or change lanes, she said she had spasms, headaches, and migraines; as a result, she had to take medication and sleep a lot.  (Tr. 2994-95.)

During the relevant period, Ms. Daniels said she received a lot of help with daily household chores from her high-school-aged daughter and her husband.  (Tr. 2995.)  She went to the grocery store, but not without someone with her to load the car, push the cart, load the groceries onto the conveyor belt, and bring the groceries into the house.  (*Id.*)  She said she

would try to help but had to use her left arm and would need to sleep and take medication, so her husband usually took care of it for her. (*Id.*)

Ms. Daniels reported receiving a disability retirement pension from the Department of Labor from her work at the United States Post Office and a 70% disability payment from the Department of Veterans Affair for her service in the Army. (Tr. 2997.) The ALJ inquired about the termination of her Workers Compensation benefits. (*Id.*) Ms. Daniels said the Post Office felt she was exaggerating or magnifying her claim and wanted her to come back to work on light duty. (*Id.*) They also said she sought mileage reimbursement for travel to doctor appointments that there was no record of her attending. (*Id.*) Ultimately, it was settled, and she was approved for a disability retirement pension with a requirement that she pay a fine relating to the claim regarding mileage reimbursement. (Tr. 2997-98.)

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the March 21, 2023 hearing.[6] (Tr. 3005-16.) The VE classified Ms. Daniels's past work as: mail carrier, a medium, semiskilled job. (Tr. 3005.) In response to the ALJ's second hypothetical question (Tr. 3006-07, 3011) which mirrored the RFC assessed by the ALJ (Tr. 2899) and included limitations of no overhead reaching, frequent lateral reaching of the right upper extremity, and frequent handling and fingering (Tr. 3007, 3011), the VE testified that the following unskilled jobs would be available: document preparer, sorter, table worker or spotter, and address clerk. (Tr. 3011-12, 3014-16.) But the VE testified that the identified jobs would not be available if the hypothetical was limited to occasional reaching in all directions. (Tr. 3014.) The VE had already explained that any

---

[6] Vocational Experts also testified at the three earlier hearings. (Tr. 85-89, 126-33, 3027-30.)

hypothetical reaching limitations had to be applied to both upper extremities because the DOT did not separate out the use of the right and left upper extremities.  (Tr. 3007-08.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his April 26, 2023 decision, the ALJ made the following findings:[7]

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2018.  (Tr. 2892.)

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 23, 2012, through her date last insured of December 31, 2018.  (*Id.*)

3.  Through the date last insured, the claimant had the following severe impairments: rotator cuff syndrome with sprain of right shoulder, degenerative arthritis of the spine, fibromyalgia, fatigue syndrome, depressive disorder with panic, obsessive-compulsive traits and post-traumatic stress, and obesity.[8]  (Tr. 2892.)

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 2893-99.)

5.  Through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) (lifting and/or carrying no more than 10 pounds occasionally and less than 10 pounds frequently) except no climbing or ladders, ropes, or scaffolds, or crawling; occasional climbing or ramps and stairs, balancing, stooping, kneeling and crouching; no overhead reaching; frequent lateral reaching of

---

[7] The ALJ's findings are summarized.

[8] The ALJ also found claimant had non-severe impairments.  (Tr. 2892-93.)

right upper extremity; frequent handling and fingering; no exposure to hazards (heights, machinery, commercial driving); and mental limitation that she perform routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions with coworkers, supervisors and public (no arbitration, negotiation or confrontation). (Tr. 2899-2923.)

6.    Through the date last insured, the claimant was unable to perform any past relevant work. (Tr. 2923.)

7.    The claimant was born in 1975 and was 43 years old, which is defined as a younger individual age 18-44, on the date last insured. (Tr. 2924.)

8.    The claimant has at least a high school education. (*Id*.)

9.    Transferability of job skills is not material to the determination of disability. (*Id*.)

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed, including document preparer; sorter; table worker, or spotter; and address clerk. (Tr. 2924-25.)

Based on the foregoing, the ALJ determined that Ms. Daniels had not been under a disability from December 23, 2012, the alleged onset date, through December 31, 2018, the date last insured. (Tr. 2925.)

## V.    Plaintiff's Argument

Plaintiff raises two assignments of error, both of which relate to the ALJ's consideration of her right shoulder impairment. (ECF Doc. 8, pp. 1, 16-25.) First, she argues the ALJ erred in evaluating medical opinions from her treating physician, the medical expert, and the state agency medical consultants, none of whom opined that Ms. Daniels could perform more than occasional reaching with her right upper extremity. (*Id*. at pp. 1, 16-23.) Second, she argues that ALJ erred in his evaluation of her subjective complaints of pain. (*Id*. at pp. 1, 23-25.)

44

# VI.     Law & Analysis

## A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th

Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence

shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a

zone of choice within which the decisionmakers can go either way, without interference by the

courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B.  First Assignment of Error: The ALJ Erred in Evaluating the Opinion Evidence

The ALJ concluded that Ms. Daniels had the residual functional capacity to perform frequent lateral reaching with her right upper extremity. (Tr. 2899.) Ms. Daniels argues that this RFC lacks the support of substantial evidence because the ALJ improperly weighed the opinions of four physicians—Dr. Breitenbach, her longtime treating physician; Dr. Golub, an impartial medical expert; and Drs. Bekal and Bolz, the state agency medical consultants—each of whom opined that Ms. Daniels's ability to reach laterally with her right upper extremity was limited, either to occasional frequency or less. (ECF Doc. 8, pp. 16-23.) She asserts that the ALJ's error resulted from a distorted interpretation of the medical evidence and a failure to consider evidence that was relevant to and consistent with the medical opinions. (ECF Doc. 8, pp. 16-23.) She further argues that the ALJ's error is not harmless because the VE testified that an individual

who was limited to no more than occasional lateral reaching with the right upper extremity could not perform the identified jobs. (ECF Doc. 8, pp. 22-23 (citing Tr. 3014).)

The Commissioner responds that the ALJ adequately explained why he discounted the reaching limitations in the medical opinions, and reasonably concluded based on substantial evidence that the clinical examination findings and Ms. Daniels's reported daily functioning did not support a limitation to occasional reaching with the right arm. (ECF Doc. 10, pp. 7-12.)

### 1.    Governing Legal Standards

Since Ms. Daniels's claim was filed before March 27, 2017, the prior rules for evaluating opinion evidence apply. Those regulations provide that every medical opinion will be evaluated, *see* 20 C.F.R. § 404.1527(c), but there is a hierarchy for evaluating medical opinions in which the well-supported opinion of a treating physician is entitled to controlling weight, *see* 20 C.F.R. § 404.1527(c)(2), and the opinion of an examining but non-treating medical source is given more weight than a non-examining medical source, *see* 20 C.F.R. § 404.1527(c)(1).

The Sixth Circuit provided detailed instructions regarding the weight to be given the opinion of a treating source under the prior regulations:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

> If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).

> The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id.* § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul.

No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  While ALJs were required to consider the factors in 20 C.F.R. § 404.1527(c)(2) in deciding what weight to give to treating source opinions, they were not required to provide a factor-by-factor analysis; their decisions only needed include "good reasons" for the weight assigned.  *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011).

When an ALJ did not give a treating source opinion "controlling weight," they were required to consider the factors set forth in 20 C.F.R. § 404.1527(c)(1)-(6)—examining relationship, treating relationship, supportability, consistency, specialization, and other factors tending to support or contradict the medical opinion—when "deciding the weight [to] give to any medical opinion." *See* 20 C.F.R. § 404.1527(c).

## 2. The ALJ Failed to Build an Accurate and Logical Bridge When Evaluating the Medical Opinion Evidence Regarding Plaintiff's Right Arm Limitations

Ms. Daniels argues that the ALJ erred by giving only partial weight to the medical opinions of her treating physician, the impartial medical expert, and the state agency medical consultants as to her ability to reach laterally with her right arm, relying on an analysis that was "not supported by substantial evidence or good reasons."  (ECF Doc. 8, pp. 15-16.)  Specifically, she argues that the ALJ "improperly ignored" the internal consistency between the opinions and evidence of her right shoulder surgeries and MRI findings, and also "minimized substantial, consistent evidence of ongoing pain and limitation" evidenced by the records.  (*Id.* at p. 16.)

The upper extremity reaching limitations in the relevant medical opinions are as follows:

- Treating physician Dr. Breitenbach opined in December 2016 that Ms. Daniels could lift or carry 0 pounds for 0 hours per day, push or pull for 0 hours per day, and reach above the shoulder for 0 hours per day.  (Tr. 970.)

48

- State agency medical consultant Dr. Bekal opined in March 2017 that Ms. Daniels could occasionally lift or carry 10 pounds, frequently lift or carry less than 10 pounds, occasionally push or pull with the right upper extremity, occasionally reach to the front or laterally with the right upper extremity, and never reach overhead with the right upper extremity.  (Tr. 148-49.)

- State agency medical consultant Dr. Bolz adopted the same limitations as Dr. Bekal on reconsideration in July 2017.  (Tr. 164-65.)

- Treating physician Dr. Breitenbach opined in March 2018 that Ms. Daniels could occasionally lift or carry 5 pounds and could frequently reach, push, or pull with her "L[eft] arm only."  (Tr. 2353-54.)

- Treating physician Dr. Breitenbach opined in December 2020 (after the 2018 date last insured) that Ms. Daniels could occasionally lift or carry 5 pounds "but not above shoulder level," and could never reach, push, or pull.  (Tr. 3609-10.)

- Independent medical expert Dr. Golub testified in March 2023, following a review of the medical file, that Ms. Daniels's impairments between December 23, 2012 and December 31, 2018 required a limitation to occasional overhead lifting of less than five pounds with the right upper extremity, and occasional lifting in other directions with that extremity "but without as much weight restriction."  (Tr. 2999-3003.)

In adopting an RFC that limited Ms. Daniels to "no overhead reaching" but "frequent lateral reaching of right upper extremity" (Tr. 2899), the ALJ gave "partial weight" to Dr. Breitenbach's December 2020 opinion and the medical opinions of independent expert Dr. Golub and state agency medical consultants Drs. Bekal and Bolz, and gave "little weight" to Dr. Breitenbach's other two medical opinions as to physical functioning (Tr. 2912-19).  Although the ALJ's analysis of the different opinions contained some distinct observations and findings, his analysis of the right upper extremity reaching limitations was repeated for each opinion discussed.  (*Id.*)

The Court will begin with the ALJ's analysis of the medical opinion of independent expert Dr. Golub, whose only opined limitations related to the right shoulder, and whose opinion the ALJ discussed first.  The ALJ gave partial weight to that opinion "because the record does not support the degree of limitation to which he opined with respect to lifting/carrying 5 pounds and only occasionally reaching in all directions with the right shoulder," explaining:

As to limitations with her right shoulder, <u>the record supports pain with range of motion in the right shoulder abduction between 90 to 120 (45 at the beginning) degrees and neck during the relevant period, with some findings of pain in the neck and shoulder to palpation;</u> however, <u>they were predominantly unremarkable with respect to reduced strength, sensation, reflexes, or remarkable findings otherwise.</u> On December 24, 2012, the claimant had pain to palpation of the right anterior shoulder; she had pain with attempted abduction of the right arm at 45 degrees; <u>she had positive Neer and Hawking sign;</u> she had palpable tenderness over the superior scapular border on the right; she had pain over the right paracervical muscles; and she had pain with extension of her neck with rotation to the left and right, but not with flexion []. On January 26, 2013, the claimant complained of right shoulder, upper back, and neck pain, but she denied neurological issues []. On exam, she appeared healthy; she was in no acute distress; her gait was normal; she had pain with range of motion of the right shoulder at 90 degrees; <u>she had positive Neer and Hawkins sign on the right shoulder;</u> her lower extremities were normal to inspection and palpation; her sensation was grossly intact to light touch; her reflexes were normal; and she was otherwise unremarkable throughout []. Her reporting and exams were substantially similar on March 12, [], March 18, 2012 [], April 5, 2013 [], May 10, 2013 [], July 17, 2013 [], August 23, 2013 [], September 20, 2013 [], December 20, 2013 [], February 24, 2014 [], July 3, 2014 [], April 2, 2015 [], June 29, 2015 [], September 28, 2015 [], and December 18, 2015 [].

As of February 2, 2016, her range of motion improved to 120 degrees without pain, and she was otherwise substantially similar as to reports and exam findings []. Thereafter she has some variability in range of motion from 90 to undocumented. On February 16, 2016, her right shoulder range of motion was at 110 degrees []. She had a few instances of some reduced range of motion to 100 and 110 on exam [], but her findings were otherwise substantially within the range of 110-120. Her right shoulder range of motion improved to 120 degrees with abduction as of October 11, 2016 [] and thereafter (See also January 18, 2017 [], February 1, 2017 [], and June 13, 2017 []). As of October 24, 2017, he noted no reduced range of motion or pain []. She was at 135 degrees abduction with pain as of October 17, 2017 []. She was back to 120 degrees as of January 30, 2018, []. As of the end of the relevant period, she was at 95 degrees of abduction with pain in the right shoulder, and reported pain was 6 out of 10 (See December 18, 2018 []). <u>The exams findings in these records were predominantly otherwise remarkable, including no noted deficits with strength, sensation, or reflexes.</u> <u>This evidence supports that the claimant would have some limitations with respect to reaching with the right upper extremity,</u> and that she should be otherwise limited to the amount of weight she would lift and carry, including handling and fingering; <u>however, it does not suggest that she would be unable to reach laterally and in front frequently within the context of sedentary exertion.</u>

The claimant was described on numerous occasions between October 2017 and December 31, 2018 as being neurologically intact []. <u>Most exam findings during this period show normal muscle strength and/or normal range of motion in her</u>

50

extremities, aside from the right shoulder []. The claimant has consistently normal sensation and normal reflexes []. The claimant was described consistently as appearing well/healthy []. This evidence does not suggest significant functional limitations from pain, loss of strength, loss of sensation, or loss of reflexes.

The claimant also reported that she is right hand dominant and has no issues with shaving, feeding herself, or using the restroom []; she did not report difficulty or issues using her hands []; she gets out of the house regularly by driving and riding in a car; and she is able to shop in stores for groceries and her children's needs []. At the consultative exam, she noted that she is able to handle her hygiene daily; she changes her clothes daily; she is able to care for her hair; she mops the floor once week; she does laundry once week; she gets her kids ready for school daily and helps with homework etc.; and she cooks dinner []. While she reported she has help, she undoubtedly has been using her right upper extremity for reaching in the front and laterally to do all of these activities throughout the day, and consistently. When considering these exam findings in the context of her reported daily functioning during this period, the record does not support that the claimant would be limited to only occasional use of her right dominant upper extremity for reaching. Her reported functioning exceeds those strict limitations. Accordingly, the undersigned does not find the portion of Dr. Golub's opinion regarding only occasional reaching with the right upper extremity and reaching overhead limited to 5 pounds, as supported by or consistent with the evidence of record.

(Tr. 2912-14 (emphasis added)).  The ALJ repeated a similar analysis for each of the other medical opinions addressed in Ms. Daniels's first assignment of error.  (*See* Tr. 2914-19.)

Ms. Daniels acknowledges that "[t]he basis for the ALJ's rejection is essentially the same for all providers" and argues that the ALJ erred because "the overwhelming, substantial and consisten[t] evidence documents continuous limitations in the right shoulder."  (ECF Doc. 8, pp. 19-20.)  In particular, she asserts that the ALJ did not "address that the objective evidence supports [continuous limitations] where Neers and Hawkins testing continuously documented ongoing limitations in Ms. Daniels' right shoulder," arguing that "[t]he positive Neers and Hawkins maneuver tests are, by definition, evidence of pain with motion of the right shoulder." (*Id.* at p. 20.)  The Commissioner argues in response that the ALJ "explained why he discounted the reaching limitations in each medical opinion by pointing to the longitudinal evidence" and "reasonably explained the weight accorded each opinion" while "look[ing] at extensive objective

findings between 2012 and 2018, as well as Plaintiff's reported symptoms during this period, and

her activities of daily living[.]"  (ECF Doc. 10, pp. 8-9.)  But the Commissioner does not

specifically respond to Ms. Daniels's argument that the ALJ did not address how the positive

Neer and Hawkins-Kennedy tests were factored into his conclusions.[9]

In explaining his reasons for discounting the right upper extremity reaching limitations,

the ALJ acknowledged that "the record supports pain with range of motion in the right shoulder

abduction between 90 to 120 (45 at the beginning) degrees" with some pain to palpation, but

asserted that findings "were predominantly unremarkable with respect to reduced strength,

sensation, reflexes, or remarkable findings otherwise."  (Tr. 2912.)  The ALJ went on to identify

representative examination findings, including two instances where positive Neer and Hawkins

signs were noted on examination.  (*Id.*)  But the ALJ did not explain how he factored those

positive impingement tests into his conclusion that examination findings were "predominantly

unremarkable" for purposes of assessing Ms. Daniels's ability to reach with her right arm.

To articulate a decision supported by substantial evidence, an ALJ need not "discuss each

piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a

reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir.

2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per

curiam)).  He may also rely on information articulated earlier in the decision to support his

findings, and is not required to rearticulate that information in the opinion analysis. *See Crum v.

Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016); *Bledsoe v. Barnhart*, 165 F. App'x

408, 411 (6th Cir. 2006).  However, the ALJ cannot simply "pick and choose" evidence in the

record, "relying on some and ignoring others, without offering some rationale for his decision."

---

[9] "The two most commonly used tests for impingement [syndrome] are Neer's Sign and the Hawkins–Kennedy test."  *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC4935057/ (last visited 3/25/2025).

*Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).  The ALJ's explanation for his rationale must also "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Here, although the ALJ's analysis of the opinion evidence is detailed and makes specific citations to the medical records, the Court finds that the lengthy analysis—repeated almost word-for-word for each of the relevant medical opinions—nevertheless fails to "build an accurate and logical bridge" between the evidence and the ALJ's findings regarding the right upper extremity limitations.  In giving reduced weight to all medical sources who offered opinions as to Ms. Daniels's ability to reach with her right upper extremity, the ALJ explained that he relied on examination findings that showed a limited range of motion in the right shoulder and pain to palpation, but which were otherwise "predominantly unremarkable."  Although he acknowledged Ms. Daniels's positive impingement test findings, the ALJ did not explain how he accounted for those findings in his analysis.  Did he consider the positive Neer and Hawkins findings to be analogous to other findings that he did account for, like limited range of motion?  Or did he consider the positive impingement findings so insignificant to the relevant limitations that they were effectively "unremarkable"?  The answer is not evident from the ALJ's written analysis.

In a situation such as this, where both the state agency medical consultants and an independent medical expert reviewed the same records and clinical findings and found that they warranted greater limitations than those adopted by the ALJ, the Court finds the ALJ's analysis failed to "build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877.  Because it is not clear whether or how the ALJ factored Ms. Daniels's largely positive impingement testing over a six-year period into his decision not to give full weight to the medical opinions limiting her ability to reach with her right arm, the Court finds the

53

ALJ's analysis is not "specific enough to permit the court to trace the path of the ALJ's reasoning." *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

The ALJ's additional reliance on Ms. Daniels's reported activities of daily living to support the weight he gave the medical opinions does not correct this deficiency.  Indeed, the ALJ's explanation for how he construed Ms. Daniels's reported activities raises additional concerns.  After the ALJ highlighted certain of Ms. Daniels's reported activities of daily living, like feeding herself, using the restroom, shaving, caring for her daily hygiene, changing her clothes daily, caring for her hair, mopping and doing laundry once a week, getting her children ready for school, helping with homework, cooking, driving, and shopping, the ALJ explained: "[w]hile [Ms. Daniels] reported she has help, she undoubtedly has been using her right upper extremity for reaching in the front and laterally to do all of these activities throughout the day, and consistently."  (Tr. 2913-14 (emphasis added) (citing Tr. 377-79, 1657-58).)

The certainty in this finding is extraordinary, particularly considering the evidence the ALJ cites in support.  For example, the ALJ observes that Ms. Daniels reported dressing herself and caring for her hygiene and hair, but Ms. Daniels explained that it hurt to put shirts over her head, that she got help washing her back, that her shoulder was tired and achy when she cared for her hair, and that she washed her hair once a week.  (Tr. 377, 1657.)  The ALJ also notes that Ms. Daniels reported driving herself, but Ms. Daniels said she drove with a full seat massager on and using a back-up camera.  (Tr. 379.)  The ALJ indicates that Ms. Daniels reported cooking, but Ms. Daniels said she shared cooking responsibilities, cooked dinner three or four times per week, and used a crockpot.  (Tr. 383, 1657.)  The ALJ also notes that Ms. Daniels reported mopping and doing laundry once a week, but she explained: "I try to do it all and get it done once a week and then medicate and sleep."  (Tr. 383.)  The ALJ additionally observes that Ms.

54

Daniels reported shopping, but Ms. Daniels explained that she shopped weekly or biweekly for an hour or two, in stores or by computer.  (Tr. 379.)

The records cited by the ALJ clearly do not support his broad assertion that Ms. Daniels "undoubtedly" used her right arm to "reach in the front and laterally . . . throughout the day, and consistently" when completing her activities of daily living.  (Tr. 2913-14.)  That expansive and unsupported conclusion misconstrues the evidence cited by the ALJ and accordingly lacks the support of substantial evidence.  *See generally Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 191 (6th Cir. 2009) (finding an ALJ decision lacked the support of substantial evidence when the decision was premised on "a clear mischaracterization of the facts"); *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787-88 (6th Cir. 2009) (finding the ALJ lacked substantial evidence to support an RFC after mischaracterizing evidence).

For the reasons set forth above, the Court finds that the ALJ failed to build an accurate and logical bridge between the evidence and the result and lacked substantial evidence to support his analysis when he: gave reduced weight to all of the medical opinions addressing Ms. Daniels's ability to reach with her right arm without clearly explaining how he factored the positive Neer and Hawkins impingement testing into his decision; and relied on an unsupported, conclusory finding that Ms. Daniels's reported activities showed she "undoubtedly" used her right upper extremity to reach in the front and laterally "throughout the day, and consistently." The Court further finds that the ALJ's errors in weighing the medical opinions were not harmless because the VE testified that an individual who was limited to occasional reaching with the right upper extremity could not perform the identified jobs.  (Tr. 3014.)

Accordingly, the Court finds that the first assignment of error has merit, and that remand is warranted.  On remand, the ALJ should accurately discuss the evidence, clearly articulate the

reasons for the weight assigned to the medical opinions, and ensure that his rationale builds an accurate and logical bridge between the evidence and the result.

**C.      Second Assignment of Error: Evaluating Plaintiff's Subjective Reports of Pain**

In her second assignment of error, Ms. Daniels argues that the ALJ decision also lacks the support of substantial evidence because the ALJ did not properly evaluate her subjective reports of pain.  (ECF Doc. 8, pp. 23-26.)  The Commissioner asserts that the ALJ properly evaluated the symptoms and found they were not entirely consistent with the evidentiary record.  (ECF Doc. 10, pp. 12-14.)

Given this Court's determination that remand is warranted for a more accurate and thorough analysis of the medical opinion evidence, it is unnecessary to address the second assignment of error.  Nevertheless, the Court observes that the ALJ's unsupported and conclusory finding that Ms. Daniels was "undoubtedly" using her right arm to reach in the front and laterally "throughout the day, and consistently" to perform her activities of daily living is repeated in the ALJ's analysis of Ms. Daniels's allegations of pain.  (Tr. 2908-09.)

On remand, the ALJ should accurately discuss the evidence, clearly articulate the reasons supporting his subjective symptom analysis, and ensure that his stated rationale builds an accurate and logical bridge between the evidence and the result.

## VII.    Conclusion

For the foregoing reasons, the Court **VACATES AND REMANDS** the Commissioner's decision for further proceedings consistent with this Opinion.  On remand, the ALJ should accurately discuss the evidence, clearly articulate the reasons for the weight assigned to the medical opinions of record and for the subjective symptom analysis, and should ensure that his rationale builds an accurate and logical bridge between the evidence and the result.


March 27, 2025

                             */s/Amanda M. Knapp*
                             AMANDA M. KNAPP
                             United States Magistrate Judge